UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FERNANDO DAVIS,

        Plaintiff,                   Case No. 11-11196

v.                                   District Judge David M. Lawson
                                   Magistrate Judge R. Steven

ROBERT J. PICKELL, ET AL.,

        Defendants.

_____ /

## REPORT AND RECOMMENDATION

On March 24, 2011, Plaintiff Fernando Davis and his wife, Shaun Davis, filed a *pro se* civil complaint bringing claims under 42 U.S.C. § 1983, as well as various state statutes. Plaintiff eventually retained counsel, who was granted leave to file an amended complaint. On February 7, 2012, counsel filed a First Amended Complaint that withdrew Shaun Davis as a plaintiff, and added Genesee County Sheriff's Deputies Buchanan and Cocking, who were originally identified as "John Doe" defendants [Doc. #21]. Before the Court is Defendants' Motion for Summary Judgment [Doc. #39], which has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that the motion be GRANTED IN PART AND DENIED IN PART.

## I.   FACTS

This case stems from the Plaintiff's arrest for operating a vehicle under the influence of liquor ("OUIL") on or about March 24, 2009. In the early morning hours of March 25, 2009, State Troopers conveyed the Plaintiff to the Genesee County Jail. Plaintiff claims that at the jail, Defendants Blaylock, Macey, Buchanan and Cocking

-1-

subjected him to excessive force during the booking and post-booking procedures. *First Amended Complaint* [Doc. #21], ¶¶ 13-17. Plaintiff alleges a constitutional excessive force claim and state law claims of assault and battery, conspiracy to violate his civil rights, and intentional infliction of emotional distress against Defendants Baylock, Macey, Buchanan and Cocking. As to Defendants Pickell and Gage, Plaintiff alleges vicarious liability based on failure to train. Plaintiff also brings official capacity claims against all Defendants.

At his deposition, the Plaintiff stated that on the night in question, he was arrested for OUIL, and that a blood draw revealed a blood alcohol content ("BAC") of 0.19, more than twice the legal limit. *Plaintiff's Deposition*, Exhibit1 to Defendant's Motion [Doc. #39], at 49-50. He was taken to the Genesee County Jail, and turned over to Sheriff's Deputies for booking. Plaintiff alleges in his First Amended Complaint that Defendants Baylock, Macey, Buchanan and Cocking "used excessive fore in their handling of Plaintiff...injuring him thereby and causing him to drop [h]is wallet and other personal items, identifications and funds." *Amended Complaint*, ¶ 13. He further alleged that when he "attempted to retrieve the fallen items and/or gain his composure, the Defendants continued to use more excessive force rendering Plaintiff...unconscious." *Id.* ¶ 14. At his deposition, however, Plaintiff testified that the allegations about dropping and retrieving his wallet were not true (having been mistakenly placed in the complaint), but that he was in fact beaten unconscious. *Plaintiff's Deposition*, 82-83, 86-87.

The Defendants provided the following account of the events surrounding Plaintiff's processing and detention in the Genesee County Jail. Deputies Baylock and Macey initially processed the Plaintiff, and placed him in a holding cell with approximately 20 other arrestees. *Baylock Deposition*, Defendants' Exhibit 2, 11-12.

Baylock claims to have observed the Plaintiff pacing back and forth and engaging in "verbal spats" with other inmates. Baylock conceded that he could not hear any conversation inside the holding cell, but observed the Plaintiff pacing and becoming agitated. *Id*. 12-13. In any event, Defendant Buchanan decided to remove the Plaintiff from the holding cell and place him is a single-inmate "safety cell." *Buchanan Deposition*, Defendants' Exhibit 3, 15-17.

Buchanan testified that she and the other Deputies asked Plaintiff to step out of the holding cell, but that he was not compliant until he was ordered three times to step out. *Id*. 16, 18. Buchanan claims that the Plaintiff walked slowly and continued to show agitated behavior, although she concedes that no physical force was used at that time. *Id*., 19-20. Buchanan testified that when Plaintiff was in the safety cell, he was asked to remove his shoes, which is standard safety procedure. However, she says, Plaintiff refused to do so, and instead "glared" and walked toward the cell door. *Id.,* 21-22. Deputy Cocking, who was also present, testified that Plaintiff "balled up his fists" as he walked toward the door. *Cocking Deposition*, Defendants' Exhibit 4, 14-15. Cocking testified that Plaintiff pushed one of his shoes part-way off with his other foot and kicked it toward Buchanan. *Id*. Cocking testified that at that point, he and other Deputies pushed Plaintiff back into the cell and took him to the ground. *Id*., 17-19. The struggle continued until Buchanan administered OC spray. *Buchanan Deposition*, 25-26. Later, Plaintiff was taken out of the cell for a shower and change of clothing, and was seen by a nurse. *Id*., 26-28.

The Plaintiff testified at his deposition that he was taken to the safety cell with his hand painfully behind his back, and that he was sprayed with mace and slammed to the ground in the hallway. *Plaintiff's Deposition*, 95, 99-100. He was taken somewhere else and beaten. *Id*. 100-101. When he came to in the cell, he was bleeding. *Id*. 102.

-3-

Obviously, Plaintiff has provided varying accounts of what happened, all of which conflict with the Defendants' version, and his deposition testimony lacks clarity. Perhaps having a 0.09 BAC has something to do with his recollection of events. In any event, both Defendants and Plaintiff have submitted a DVD that chronicles the sequence of events on March 25, 2009. *See* Defendants' Exhibit 6 and Plaintiff's Exhibit 1. The DVD is divided into 17 different segments, each depicting the action as recorded on a specific camera during a specific time frame. There is no sound. Because the cameras are placed in different areas of the jail, and show different angles, some of the recorded segments may show what is occurring at the same time in different locations or from different visual perspectives. For example, camera #1 shows the hallway outside the safety cell, and camera #10 shows the inside of the safety cell. Taken together, the 17 segments are chronological, from Plaintiff's arrival at the booking area to the physical encounter between the Defendants and the Plaintiff, to the Plaintiff's return to the safety cell after seeing the nurse.

At oral argument on this motion, Plaintiff's counsel agreed that the DVD constitutes the only evidence that would show a legitimate issue of fact as to the § 1983 and assault and battery claims. The following is a summary of each relevant DVD segment:

Tape [05]   Plaintiff is brought into the booking area.  At 36:19, a deputy pats him down, and takes his belt. Plaintiff removes his shoes and socks.  The deputy returns them, and Plaintiff puts them back on.  He is then escorted out of the area with another prisoner. Throughout, Plaintiff appears cooperative and responsive to orders. Tape concludes at 43:10.

Tape [08]   At 43:07 to 44:34, Plaintiff is taken through the lobby/booking area.

-4-

He still appears cooperative.

Tape [07] Same as Tape [08],but from a different angle, specifically looking out from behind the glassed in area.

Tape [09] Again the lobby/booking area. Plaintiff leaves the area at 44:47.

Tape [04]   This is a holding area with a large number of prisoners; at least one is seated, many appear to be sleeping on the floor. The Plaintiff, wearing tennis shoes and a sweatshirt, enters at 49:04.  He stands/walks for a short time, appears to possibly be speaking to other prisoners. Most of the other prisoners remain sleeping. A man is seated at a small bench, looks around, but otherwise remains seated. The Plaintiff sits down next to him, does not appear particularly agitated or aggressive. At 51:20, deputies enter and appear to speak to the Plaintiff, who gets up and accompanies them out of the cell.

Tape [09]   Again, the lobby/booking area. The Plaintiff and the deputies enter at 46:37.  Plaintiff stops momentarily and appears to be taking to the deputies. He is not in restraints, and there is no physical contact between him and the deputies. He generally appears non-aggressive and cooperative, and leaves the area with the deputies at 47:24.

Tape [01]   This is a hallway outside of the one-person safety cell. At 51:42, the Plaintiff enters the cell in the company of six deputies. Two deputies, including Deputy Buchanan, leave the cell.  At 53:15, a jacket is thrown out of the door into the hallway.

Tape [10]   This is the inside of the safety cell.  There is what appears to be a metal cot built into the far wall.  The Plaintiff enters the cell at 51:43.  He stands by the cot (opposite the door), and appears to gesture. He then walks toward the door. As he approaches the door, the Deputies enter *en masse* and grab the Plaintiff, taking him to the ground.  During the scuffle that ensues, it is difficult to see the Plaintiff since the Deputies are on top of him, but the Deputies appear to be engaged in an aggressive struggle.

-5-

Plaintiff's jacket is removed, and at 52:47, one of the Deputies appears to be either removing the Plaintiff's jacket (Plaintiff still cannot be seen) or punching him.  At 53:15, it appears that the Plaintiff is pepper-sprayed. The Deputies exit the cell at 53:20, leaving the Plaintiff face-down on the floor. At 53:11, the Plaintiff gets up slowly.  He appears to be in a great deal of discomfort, staggering about the cell and rubbing his eyes. Approximately 50 minutes later, at 141:04, two Deputies enter the cell and escort the Plaintiff out. At this time, there appears to be blood in the toilet.

Tape [01] At 1:40, the Deputies are bringing the Plaintiff out of the cell into the hallway.

Tape [13]   This tape is designated "Property Room."  At 1:59, the Deputies are bringing the Plaintiff down the hallway, toward the camera.  The Plaintiff enters what appears to be the nurses' station at 2:00, wearing different clothes.

Tape [09]   Again, the booking area.  Plaintiff enters at 1:39, with a cloth over his face.

Tape [13]   Plaintiff enters the nurses' station at 2:00, and leaves at 2:03.

Tape [01]   Plaintiff is taken back to the single-prisoner cell at 2:04.

Tape [10]   Plaintiff enters the cell at 2:04. It appears that the cell and the toilet have been cleaned.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue

-6-

of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).
Drawing all reasonable inferences in favor of the non-moving party, the Court must
determine "whether the evidence presents a sufficient disagreement to require submission
to a jury or whether it is so one-sided that one party must prevail as a matter of law."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). Entry of summary judgment is appropriate "against a party who fails to make a
showing sufficient to establish the existence of an element essential to that party's case,
and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*,
477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a
whole could not lead a rational trier of fact to find for the nonmoving party," there is no
genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v.
Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

### III.   DISCUSSION

### A.   Excessive Force

The Defendants argue as follows regarding the excessive force and assault and
battery claims:

> "Plaintiff's claims of excessive force and assault and battery cannot be
> sustained on the facts. For Plaintiff's own safety, as well as the safety of the
> officers, Plaintiff's shoes and jacket had to be removed when he was placed
> in the safety cell. At the time that the force was used, Plaintiff was actively
> resisting officers, refusing to follow verbal commands, had approached the
> deputies with an aggressive posture and actually assaulted a deputy by
> kicking his shoe at him. Defendants used only the force necessary to gain
> compliance by Removing Plaintiff's restricted items, then immediately left.
> There was no excessive force or assault and battery as a matter of law."
> *Defendants' Brief* [Doc.#39], at 12.

Defendants also assert the affirmative defense of qualified immunity. *Id*. at 14. A
state official is protected by qualified immunity unless the Plaintiff shows (1) that the
Defendant violated a constitutional right, and (2) the right was clearly established to the

-7-

extent that a reasonable person in the Defendant's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194 (2001). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that the two-step sequential analysis set forth in *Saucier* is no longer mandatory.   Rather, *Pearson* commended the order of inquiry to the judge's discretion, to be exercised on a case-by-case basis. The first question, then, is which constitutional right governs Plaintiff's excessive force claim.

In *Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010), the Sixth Circuit clarified the standard that would be applied to excessive force claims brought by individuals who, like the Plaintiff, had been arrested and turned over the jail authorities for booking, but who had not yet appeared before a judge for a probable cause hearing.  For example, an excessive force claim that arises in the context of an arrest or investigative stop of a free citizen is clearly analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). A claim brought by a convicted defendant serving a jail or prison sentence is governed by the Eighth Amendment proscription against cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 318-322 (1986).  Where neither the Fourth Amendment nor the Eighth Amendment applies, as in the case of a pretrial detainee, the Fourteenth Amendment applies. In *Aldini*, the Sixth Circuit held that during the time an individual is in custody between his arrest and his appearance before a judge, the Fourth Amendment applies.

The Fourth Amendment standard is objective, and is applied without reference to the officer's subjective motivations.  *Graham v. Connor, supra*. The "'proper application' of the reasonableness inquiry 'requires careful attention to the facts and circumstances of each particular case....'" *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005), quoting *Graham*, 490 U.S. at 396.  The standard "contains a built-in measure of deference to the

-8-

officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).  A court must recognize that "officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham* at 397.

However, the facts giving rise to Plaintiff's claims occurred more than a year before *Andini* was decided.  The Defendants argue that at that time, it was not clearly established that the Fourth Amendment governed excessive force claims, and that therefore, for purposes of a qualified immunity analysis, the Fourteenth Amendment due process standard should be applied.  "A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the "objective reasonableness" test of *Graham,* in which excessive force can be found if the officer's actions, in light of the totality of the circumstances, were not objectively reasonable." *Darrah v. City of Oak Park*, 255 F.3d 301, 305 -306 (6th Cir. 2001). To rise to the level of a substantive due process violation, the officers' conduct must "shock the conscience." *Id.*; *County of Sacramento v. Lewis,* 523 U.S. 833, 846-847 (1998).

While substantive due process involves a higher standard, it does not involve no standard, and does not give jail officials free rein to mete out physical punishment at will. "It is clear...that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395, n. 10.  Moreover, "public servants' reflexive actions 'shock the conscience' only if they involved force employed 'maliciously and sadistically for the very purpose of causing harm' rather than 'in a good faith effort to maintain or restore discipline.'" *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th Cir.2000) (quoting *Lewis,* 523 U.S. at 852–53).

-9-

To assess whether there is a legitimate and triable question of fact as to whether the Deputies' conduct in this case violated a clearly established constitutional right, I will apply the Fourteenth Amendment "shocks the conscience" standard.  If, viewing the facts in the light most favorable to the Plaintiff, he has made out a due process claim, he has necessarily shown a Fourth Amendment violation as well.  *Andino*, 609 F.3d at 867.[1]

Plaintiff's case rises or falls on the tape. Defendants rely on *Scott v. Harris*, 550 U.S. 372 (2007), where a police videotape of a high-speed chase flatly contradicted the plaintiff's claim that the road was mostly empty and that he remained in control of his car. The videotape showed the Plaintiff's car "racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast." The car swerved around more than a dozen other cars and forced cars travelling in both directions to the shoulder to avoid being hit. *Id.* at 379-380. The Supreme Court stated, "Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort...." *Id.* Noting that "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him," the Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. In such case, the Court held, there is no "genuine" dispute as to the facts. *Id.*

In contrast to the videotape in *Scott*, the tape in this case does not unambiguously support the Deputies. While it does not necessarily contradict their version of the events,

---

[1] I make no determination at this time whether a Fourteenth Amendment or a Fourth Amendment standard would apply at trial.

neither is it inconsistent with the Plaintiff's claim that he was beaten without justification. Unlike the situation in *Scott*, any exculpatory (if that is the word) inferences to be drawn from the tape depend on the whether the trier of fact believes the Deputies.

For example, the Deputies maintain that prior to the physical confrontation, the Plaintiff was aggressive and hostile. Yet the first segment, tape [05], shows the Plaintiff being brought into a processing area without incident. He sits calmly on a bench while two Deputies appear to be preparing paperwork. At one point, he submits to a pat-down search and, apparently in response to the Deputies' command, he removes his shoes and socks. Later, the shoes and socks are returned to him, and he puts them back on. In the second segment, tape [06], he is then led without incident to the holding cell. There is no obvious sign of hostility; to the contrary, Plaintiff appears to be nothing but cooperative with the Deputies.

Deputy Baylock testified that in the holding cell, he observed the Plaintiff pacing back and forth and engaging in "verbal spats" with other inmates, although he conceded that he could not hear anything. Nevertheless, Baylock said that the Plaintiff was pacing and becoming agitated. The tape [09] shows Plaintiff entering the cell, in which one other prisoner is seated on a small bench, but most of the others are sleeping on the floor. The Plaintiff does walk back and forth for a short time, and the person who is seated on the bench moves his head, but most of the other prisoners are still sleeping, not engaging in "verbal spats." At one point, the Plaintiff sits down on the bench next to the other prisoner, and both appear to sit quietly. When the Deputies open the door, the Plaintiff appears to comply with their order to get up and go with them.

There is no physical contact between the Plaintiff and the Deputies as they escort him to the safety cell. At one point, as they walk through the booking area (tape [09]),

-11-

Plaintiff stops for about four seconds (47:11 to 47:15) and talks with the Deputies, but again, there is no physical contact, and at 47:24, Plaintiff continues on with the Deputies.

In tape [01] (showing the hallway outside the safety cell) at 51:42, the Plaintiff enters the safety cell in the company of six Deputies, and two of them leave. At 53:15, a jacket flies out of the door into the hallway, and at 53:27, the door is closed.

The action inside the safety cell is shown on tape [10]. The Plaintiff enters the cell at 51:43, and is seen standing by the metal bunk opposite the door. He gestures with his hands; whether his fist is balled, as Deputy Cocking testified, is not clear from the tape, but is a matter of interpretation. Likewise, the tape is anything but clear as to whether the Plaintiff "glared," as Deputy Buchanan testified. The Plaintiff walks toward the door, but not necessarily in a hostile or aggressive manner. The Deputies enter, taking the Plaintiff to the ground aggressively. Two Deputies, including Buchanan, leave. The remaining Deputies are on top of the Plaintiff, and while they clearly remove his jacket, the tape is less clear as to whether they punch or kick the Plaintiff. He appears to be pepper-sprayed at around 53:15. When the deputies leave at 53:20, the Plaintiff is lying face down on the floor of the cell. He slowly gets up at 53:51, and remains in the cell, in obvious discomfort, going back and forth to the toilet and sink, until around 50 minutes later, when two Deputies come for him at 141:04. There appears to be blood in the toilet.

Unlike the tape in *Scott*, which unambiguously showed the plaintiff's version of events to be false, these tapes, viewed in the light most favorable to the Plaintiff, support his claim that the Deputies beat him and assaulted him not in order to maintain discipline, but without cause, for the purpose of punishment. This creates an issue of fact as to both a Fourth and Fourteenth Amendment violation, *see Graham*, 490 U.S. at 395, n. 10 and *Lewis,* 523 U.S. at 852–53, and at the same time defeats a claim of qualified immunity,

-12-

since the Fourteenth Amendment protection against gratuitous violence at the hands of state officials was clearly established at the time of this incident.

For these reasons, Defendants' motion for summary judgment as to the § 1983 excessive force claim should be denied.

## B.   Assault and Battery

If there is sufficient evidence of improper use of excessive force to defeat summary judgment as to the § 1983 claim, there is necessarily sufficient evidence to support the state law claim of assault and battery. Thus, summary judgment should be denied on the assault and battery claim as to Defendants Baylock and Macey, who were named in the original complaint.

Deputies Buchanan and Cocking, however, were originally named as "John Doe" Defendants. They were not specifically identified until Plaintiff filed his amended complaint on February 7, 2012.  They argue that the amended complaint does not relate back to the original complaint, and therefore the assault and battery claim is time barred.

The statute of limitations for assault and battery is two years. M.C.L.  § 600.5805(2). The alleged assault and battery occurred on March 24, 2009, and the statute of limitations expired on March 24, 2011, the date the original complaint was filed. The amended complaint that identified Buchanan and Cocking for the first time was filed on February 7, 2012, well outside the statute of limitations. Therefore, the claim of assault and battery must be dismissed against them unless the amended complaint relates back to the original complaint.

In *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996), the Court held that "[s]ubstituting a named defendant for a 'John Doe' defendant is considered a change in parties, not a mere substitution of parties. Therefore, the requirements of Fed.R.Civ.P.

-13-

15(c) must be met in order for the amendment adding the named defendant to relate back to the filing of the original complaint." Fed.R.Civ.P. 15(c) provides as follows:

**(c) Relation Back of Amendments.**

**(1)** ***When an Amendment Relates Back.*** An amendment to a pleading relates back to the date of the original pleading when:

**(A)** the law that provides the applicable statute of limitations allows relation back;

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or

**(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

**(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and

**(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Because the amendment in this case changes the naming of a party, Rule 15(c)(1)(C) is the operative section. Thus, for the amendment to relate back, Plaintiff must show that within 120 days of March 24, 2011 (the filing of the original complaint), Buchanan and Cocking received notice of the action, and knew or should have known that the action would have been brought against them but for the mistake in their identity.

The 120 day period from the filing of the complaint expired on July 22, 2011. In their affidavits (Exhibit B to Defendants' Reply Brief, Doc. #47), Buchanan and Cocking state that their first notice that Plaintiff filed a lawsuit was in September of 2011, when they were scheduled to meet with Defendants' attorney on September 20, 2011. Buchanan and Cocking were both deposed on December 21, 2011. Because these Defendants did not have notice until after the expiration of 120 days from the filing of the complaint, Plaintiff

-14-

has not satisfied Rule 15(c).

Plaintiff speculates that Buchanan and Cocking must have known about the lawsuit earlier because "[t]he facts and circumstances of Plaintiff's jail beatings could not have been investigated after the initiation of the lawsuit without information from Defendants Buchanan and Cocking." *Plaintiff's Response* [Doc. #44], at 9. This is not necessarily so. The Court did not enter a scheduling order until August 29, 2011 [Doc. #14], which was well outside the 120-day period. According to these Defendants' affidavits, they did not receive a communication to meet with the attorney until September.[2] Plaintiff may not rely on speculation to defeat a motion for summary judgment. *Clemente v. Vaslo*, 679 F.3d 482 (6th Cir. 2012), citing *Lewis v. Phillip Morris, Inc.*, 355 F.3d 515533 (6th Cir. 2004). Therefore, Plaintiff has not met his summary judgment burden on the relation back issue, and the assault and battery count must be dismissed as to Buchanan and Cocking as time barred.

### C.   Intentional Infliction of Emotional Distress

To establish a Michigan common law claim of intentional infliction of emotional distress ("IIED"), a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v. Ford*, 237 Mich.App. 670, 674, 604 N.W.2d 713 (1999). *See also Roberts v. Auto-Owners Insurance Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985). Liability under this theory requires that the conduct complained of "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

---

[2] The Sheriff's Investigation Report (Exhibit A to Defendants' Reply Brief, Doc. #47), prepared by Lt. Pamela Crawford, indicates that the original incident reports written by Deputies Buchanan and Cocking were reviewed, but in no way suggests that Lt. Crawford personally interviewed Buchanan and Cocking.

atrocious and utterly intolerable in a civilized community." *Graham*, 237 Mich.App. at 674. This is a demanding standard: It is not sufficient to show that the defendant acted tortiously, intentionally, or even criminally. *Id.* The test has been described as whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts*, 422 Mich. at 603.

As discussed above, there is a question of fact as to whether Defendants Baylock, Macey, Buchanan and Cocking violated Plaintiff's constitutional rights by using excessive force. Accordingly, there are sufficient facts for a jury to find that Sheriff's Deputies administered a severe and unprovoked beating to an intoxicated prisoner. This could be fairly characterized as outrageous behavior. Summary judgment should be denied as to the IIED count.

### D.   Conspiracy

Plaintiff brings a state law conspiracy claim against all Defendants. However, all of the Defendants are Genesee County Sheriff's Deputies, and all were acting as such at the time of the alleged incident that occurred at the Genesee County Jail. Because they were all members of the same legal entity (the Sheriff's Department), the conspiracy claim is barred by the intracorporate conspiracy doctrine, which states as follows:

> "According to the intracorporate conspiracy doctrine, members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment."

*Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002). The intracorporate conspiracy doctrine is applicable to governmental entities. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir.1991)(applying

-16-

doctrine where conspiracy was alleged between school superintendent, executive director of the district, and a school administrator); *Jocham v. Tuscola County*, 239 F.Supp.2d 714, 732 (E.D.Mich. 2003)(stating, in *dicta*, that doctrine would preclude a conspiracy claim against County Commissioners).

Summary judgment should therefore be granted on the conspiracy claim.

### E.    Claims Against Pickell and Gage

Defendant Pickell is the elected Sheriff of Genesee County. He did not personally participate in any of the alleged misconduct on March 24, 2009. Plaintiff alleges that Pickell "knew or should have known" of the Defendant Deputies' actions, and that he failed to train or supervise them properly. *Amended Complaint*, ¶¶ 16(e) and 17(e).

The Supreme Court has specifically held that in a §1983 action, liability cannot be based on a theory of *respondeat superior*, or mere supervisory liability. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978). Because Plaintiff has not provided any evidence that Sheriff Pickell impliedly authorized, approved or knowingly acquiesced in the other Deputies' allegedly unconstitutional conduct, the supervisory claims should be dismissed. *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984). *Bellamy* held that it must be shown that supervisor "actively participated in or authorized" challenged conduct. *Id.* Moreover, even being aware of an inmate's complaint and failing to take action does not create liability under § 1983. *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).

In addition, § 1983 liability can be based on a policy of inadequate training or supervision, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

-17-

The Defendants have proffered considerable testimony of the training protocols at the Genesee County Jail, including the month-long training given to new corrections Deputies (Baylock deposition, Def.'s Exh. 2, pp.7-9), the in-service and refresher training given to all Deputies (Gage deposition, Def.'s Exh. 7, p. 17), and the investigatory, discipline and additional training protocols employed in the context of internal investigations of alleged misconduct (*id.*, pp. 25-27; Buchanan deposition, Def.'s Exh. 3, p. 29; Cocking deposition, Def.'s Exh. 4, p. 22). Plaintiff, on the other hand, essentially relies on this single incident where the Defendants allegedly breached the Jail's policies.

Again, a claim of failure to train requires a showing of deliberate indifference to the rights of jail inmates. Where, as here, the training regimen itself is adequate, supervisory or municipal liability cannot be premised on a single incident of a deputy violating policy or acting improperly. *Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350 (2011). In *Austin v. Redford Tp. Police Dept.*, 859 F.Supp.2d 883, 904 -906 (E.D.Mich. 2011), the Court explained as follows:

> "[T]o establish a municipality's liability on a failure to train theory, plaintiff must show that the allegedly inadequate training amounted to 'deliberate indifference' on the part of the Township. 'A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.' *Connick,* 131 S.Ct. at 1360 (quoting *Bryan County,* 520 U.S. at 409, 117 S.Ct. 1382); *see also, City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) (footnotes omitted) ('[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation'); *id.* at 833, 105 S.Ct. 2427 (Brennan, J., concurring in part) ('[T]here may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right, but the scope of § 1983 liability does not permit such liability to be imposed merely on evidence of the wrongful actions of a single city employee not authorized to make city policy.')."

Likewise, Plaintiff has failed to support any claim against Undersheriff Gage, who

-18-

had no personal involvement in the incident. *Bellamy v. Bradley, supra*.

### F.  Official Capacity/Municipal Liability

A lawsuit naming a defendant in his or her official capacity is a lawsuit against the pubic entity that employs that defendant, in this case, the County of Genesee. However, as discussed above, under *Monell* the County has no *respondeat superior* liability, even assuming that its officers acted improperly. ("A municipality cannot be held liable *solely* because it employs a tortfeasor - - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). *Id.* 436 U.S. at 691 (emphasis in original).

The *Monell* Court found that when the acts of individual employees represent the government's custom or policy, the municipality can be held liable. *Id* at 638. In this case, however, Plaintiff has at most shown that the individual Defendants violated policies, not that they acted in accordance with improper policies.  In  *Johnson v. City of Detroit*, 944 F.Supp. 586, 598 (E.D. Mich. 1996), the Court explained, "The requirement of an official policy distinguishes the acts of the employee from those of the municipality, ensuring that the municipality is held responsible only for the latter." In other words, "a municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691.

Accordingly, Plaintiff's official capacity claims must be dismissed.

### IV.   CONCLUSION

For these reasons, I recommend that Defendants' Motion for Summary Judgment [Doc. #39] be GRANTED IN PART AND DENIED IN PART, as follows:

(1)  That the motion be DENIED regarding the constitutional claim of excessive force as to Defendants Baylock, Macey, Buchanan and Cocking.

(2)  That the motion be DENIED regarding the state law claim of assault and battery as to Defendants Blaylock and Macey.

(3)  That the motion be DENIED regarding the state law claim of intentional infliction of emotional distress as to Defendants Baylock, Macey, Buchanan and Cocking.

(4)  That the motion be GRANTED regarding the assault and battery claim as to Defendants Buchanan and Cocking.

(5)  That the motion be GRANTED as to the claim of conspiracy.

(6)  That the motion be GRANTED as to all claims against Defendants Pickell and Gage.

(7)  That the motion be GRANTED as to all official capacity claims.

Any objections to this Report and Recommendation must be filed  within fourteen (14) days of service of a copy hereof, including weekends and intervening holidays, as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, including weekends and intervening holidays, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by

motion and order such page limit is extended by the court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.


                                        s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Date: February 6, 2013

---

**CERTIFICATE OF SERVICE**

        I hereby certify on February 6, 2013, I electronically filed the foregoing paper with the Clerk of the Court
sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper
was mailed to the following non-registered ECF participants on February 6, 2013: **None**


                                        s/Terri L. Hackman
                                        Judicial Assistant to
                                        Magistrate Judge R. Steven Whalen